**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
MATTHEW GIUCA, M.D., and CARL      :
SCHMIGELSKI, M.D.,      :
     :
           Plaintiffs,      :     Case No. 21-3814
     :
       -against-      :
     :     **COMPLAINT**
NASSAU ANESTHESIA ASSOCIATES, P.C.,      :
and ENVISION HEALTHCARE      :
CORPORATION,      :     **JURY TRIAL DEMANDED**
     :
           Defendants.      :
-------------------------------------------------------------X

       Plaintiffs, MATTHEW GIUCA, M.D. and CARL SCHMIGELSKI, M.D., by and

through their attorneys, Goodstadt Law Group, PLLC, as and for their Complaint against

Defendants NASSAU ANESTHESIA ASSOCIATES, P.C. and ENVISION HEALTHCARE

CORPORATION, hereby state and allege as follows:

## PRELIMINARY STATEMENT

       1.     There have been more than 33,490,000 cases of COVID-19 and nearly 602,000

COVID-19 related deaths in the Unites States.

       2.     Hospitals and medical practices, perhaps more than any other employer, have an

incredibly important duty during the COVID-19 pandemic to take all reasonable and necessary

precautions to protect their physicians, nurses, staff and patients from the spread of this deadly

virus by providing and requiring their staff to wear adequate personal protective equipment

("PPE").

       3.     Indeed, since the onset of COVID-19 in March 2020, the Centers for Disease

Control and Prevention ("CDC") has been clear that hospitals must promote patient safety and

the safety of their healthcare workers through, among other things, improved use of PPE by healthcare workers when caring for patients with confirmed or suspected cases of COVID-19.

4.     Defendant Envision Healthcare Corporation ("Envision") is a family of healthcare companies that owns Defendant Nassau Anesthesia Associates, P.C.'s ("NAA," and together with Envision, "Defendants"), which is an anesthesia and pain management medical practice that provides anesthesia and pain treatment services to NYU Langone Hospital Long Island (formerly NYU Winthrop) ("NYU" or "NYU-Winthrop") and other local surgery centers and office-based practices.

5.     Indeed, Defendants describe themselves as being "responsible for the safety and well-being of patients before, during and after surgery."

6.     Unfortunately, however, when it came time to protect Plaintiffs and their patients during the COVID-19 pandemic, Defendants betrayed their stated mission, the CDC's guidelines, and best medical practices regarding safety by abandoning their support for Plaintiffs' complaints regarding NYU's failure to provide them appropriate PPE.  Rather, they decided to look after their own checkbook at the expense of physician and patient safety.

7.     When people throughout New York and the rest of the world were locked down at home, Plaintiffs and their colleagues risked their own lives on the front lines treating the most dire patients, many of  whom were kept alive through the use of ventilators and other treatments. Notwithstanding the CDC's guidelines for protecting Plaintiffs and the other front-line workers through the use of appropriate PPE, NYU-Winthrop Hospital – the hospital to which Plaintiffs were assigned by Defendants – refused to provide the appropriate PPE to Plaintiffs and its other front-line workers, creating a severe public safety risk to physicians, staff and patients.

8.      Plaintiffs – who were gravely concerned about this significant risk to themselves and others – complained to their supervisors both at NYU and at Defendants about the health and safety risks posed by the lack of appropriate PPE.  Although Defendants initially agreed with Plaintiffs' complaints about the need for appropriate PPE, Defendants failed to continue to support Plaintiffs' efforts to require NYU to supply such PPE and, instead, sided with NYU because they placed a premium on their revenues over the health and safety of Plaintiffs and their other physicians.

9.      And, rather than support Plaintiffs in their efforts to demand that NYU secure and provide the necessary protective equipment while treating COVID-19 patients, Defendants retaliated against them for their numerous complaints about the attendant safety risks resulting from the lack of adequate PPE.

10.      Defendants' unlawful misconduct did not end there.  Indeed, notwithstanding the fact that Plaintiffs each had written employment agreements with Defendants setting forth, among other things, their wages and paid time off, and risked their health by showing up to the hospital every shift during the pandemic to care for patients suffering from COVID-19, Defendants intentionally breached these written agreements by unilaterally deducting 30% from Plaintiffs' contractually earned wages (and subsequently deducting 15% from such earned wages), in breach of their agreements and in violation of Article 6 of the New York Labor Law ("NYLL").

11.      When Plaintiffs complained about these violations of the NYLL, Defendants refused to comply with their material obligations.  Rather, they engaged in additional acts of retaliation against Plaintiffs to damage their reputations and standing both inside and outside of

the hospital, which resulted in a significant loss of senior positions, career progression and compensation opportunities both at NYU and elsewhere.

12.     Defendants' retaliatory misconduct went even further.  Plaintiffs complained to human resources and other senior executives at Defendants about the unlawful racist and sexist misconduct of one of Defendants' other physicians towards other employees at Defendants and NYU-Winthrop Hospital.  Rather than taking any remedial measures to discipline or remove this offending physician, Defendants blamed Plaintiffs and subjected them to further retaliation while supporting the offending physician, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as well as the New York State Human Rights Law ("NYSHRL").  Indeed, it was not until very recently – after multiple complaints over many years by Plaintiffs – that Defendants attempted to perform any real "investigation" into these allegations.

13.     Finally, when Plaintiffs suffered from their respective disabilities, Defendants utterly failed to satisfy their obligations under the Americans with Disabilities Act, as amended ("ADA") and the NYSHRL to engage in the interactive process to determine whether a reasonable accommodation could be offered to Plaintiffs to perform their essential job duties. Rather, while Plaintiffs were out on medically approved leaves of absences, Defendants began removing Plaintiffs from important communications and completely shut them out of what remained of their leadership roles within the group, in violation of the Family Medical Leave Act ("FMLA"), which effectively minimized their roles to the point where Dr. Giuca was forced to leave his position with Defendants at NYU and Dr. Schmigelski has lost his prominent roles and potential promotion opportunities.

14.     This is an action for injunctive and equitable relief, as well as monetary damages, liquidated damages, compensatory damages, punitive damages, other non-economic damages and attorneys' fees and costs, to redress Defendants' (i) breach of contract, (ii) violations of Article 6 of the NYLL, (iii) violations of Section 215 of the NYLL, (iv) violations of the NYSHRL, (v) violations of the ADA, (vi) violations of the FMLA, and (vii) violations of the anti-retaliation provisions of NYLL's Healthcare Whistleblower Protection Act, NYLL § 741.

15.     Defendants' misconduct was intentional, knowing, malicious, willful and wanton and/or showed a reckless disregard for Plaintiffs, which has caused and continues to cause them to suffer substantial economic and noneconomic damages, permanent harm to their professional and personal reputations, and mental anguish and emotional distress.

## PARTIES

16.     Plaintiff Matthew Giuca, M.D. ("Dr. Giuca") is a resident of Suffolk County in the State of New York.  At all times relevant hereto, Dr. Giuca was employed by Defendants Nassau Anesthesia Associates, P.C. and Envision Healthcare Corporation, and was an "employee" and "eligible employee" within the meaning of all applicable statutes and a health care employee within the meaning of NYLL § 741.

17.     Plaintiff Carl Schmigelski, M.D. ("Dr. Schmigelski") is a resident of Suffolk County in the State of New York.  At all times relevant hereto, Dr. Schmigelski was employed by Defendants Nassau Anesthesia Associates, P.C. and Envision Healthcare Corporation, and was an "employee" and "eligible employee" within the meaning of all applicable statutes and a health care employee within the meaning of NYLL § 741.

18.     Upon information and belief, Defendant Nassau Anesthesia Associates, P.C. is a domestic professional corporation incorporated and authorized to do business in the State of New York and elsewhere in the United States, with its principal place of business located at 216 1st Street, Mineola, New York 11501.  At all relevant times herein, Defendant Nassau Anesthesia Associates, P.C. employed Plaintiffs and was an "employer" and "covered employer" within the meaning of all applicable statutes.

19.     Upon information and belief, Defendant Envision Healthcare Corporation is a foreign corporation incorporated in the State of Delaware and is authorized to do business in the State of New York and elsewhere in the United States, with its principal place of business located at 1A Burton Hills Boulevard, Nashville, Tennessee 37215.  At all relevant times herein, Defendant Envision Healthcare Corporation employed Plaintiffs and was an "employer" and "covered employer" within the meaning of all applicable statutes.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights under the ADA and FMLA.  Further, the Court has supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this District.

## ADMINISTRATIVE PROCEDURES

22.     On or about June 9, 2021, Plaintiffs each filed a charge of discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC"), alleging violations of the ADA  The Charge arises out of the same facts alleged herein.

23.     On or about June 23, 2011, Plaintiffs each received their Notice of Right to Sue from the EEOC.  This action originally was filed within 90 days of Plaintiffs' receipt of her Notice of Right to Sue from the EEOC.

24.     Any and all other prerequisites to the filing of this suit have been met.

## FACTUAL ALLEGATIONS

**Defendants are Plaintiffs' Joint Employers**

25.     At all relevant times, Plaintiffs were jointly employed by Defendants NAA and Envision.

26.     In or around December 2018, Defendant Envision purchased all of the assets of NAA, which was memorialized in a Stock Purchase Agreement, dated as of December 18, 2018.

27.     As part of the purchase, Defendant Envision required Plaintiffs to execute employment agreements with Defendant NAA, also dated as of December 18, 2018, and signed at the same time of the Stock Purchase Agreement, which were executed on behalf of Defendant NAA by Dr. Steven Scheinman, who is the National Medical Director of Ambulatory Anesthesia at Defendant Envision.

28.     During the course of Plaintiffs' employment with Defendants, Defendant NAA issued payroll checks to Plaintiffs; however, for all other purposes, Defendant Envision controlled the terms and conditions of Plaintiffs' employment.

29.     During the course of their employment, Defendant Envision employees supervised and otherwise controlled the conditions of Plaintiffs' employment, including, but not limited to, a shared human resources function.

30.     During all relevant times, Plaintiffs were required to comply with Defendant Envision's policies, including, but not limited to, their employee handbook.

31.     Defendants NAA and Envision each has the power to hire and fire employees, as well as make other important personnel decisions, at Defendant NAA.

**Plaintiffs' Employment with Defendants**

32.     Dr. Giuca joined Defendant NAA as an anesthesiologist in or around April 2011. Dr. Giuca is a highly regarded anesthesiologist, and was a member of the Board of Directors of Defendant NAA prior to its acquisition by Defendant Envision.  Dr. Giuca has a stellar national clinical and academic reputation, and has received many teaching awards and accolades.  He created medical education programs for Harvard and John Hopkins Medical Schools, and serves as one of the architects for the newly created NYU-Long Island School of Medicine.  Dr. Giuca also is a well-known patient safety expert who has been utilized at NYU-Long Island as a leader for many programs designed to improve patient care.  In recognition of the achievements, Dr. Giuca was appointed Co-Chief of Defendant NAA (along with Dr. Schmigelski) prior to the unlawful retaliation committed by Defendants described herein.

33.    Dr. Schmigelski joined Defendant NAA as an anesthesiologist in or around August 1998.   Similar to Dr. Giuca, Dr. Schmigelski has had a stellar career as an anesthesiologist.   As Director of Non-Operating Room Anesthesia, Dr. Schmigelski has been responsible for the expansion of services provided by the Department of Anesthesiology to various areas within NYU-Winthrop Hospital, including the GI Lab, Specials, Radiology, EP Lab, TEE Lab, Ultrasound Suite, and MRI Suite.   In addition, Dr. Schmigelski developed the program for providing anesthesia services at the Pediatric Division of Hematology/Oncology (also known as the Cancer Center for Kids), where he holds the title of Director of Anesthesia. Indeed, Dr. Schmigelski worked his way to being a member of the Board of Directors of Defendant NAA, as well as Co-Chief of Defendant NAA prior to the unlawful retaliation committed by Defendants described herein.

34.    In addition, Dr. Schmigelski was voted onto NAA's Board of Directors in or around 2017 in recognition of his stellar business and managerial acumen.

35.    Under Plaintiffs' leadership on NAA's Board of Directors in 2018, Defendant NAA had its highest collection year in its history, and Defendant NAA was able to recruit new staff to replace the large staff turnover under the prior board.

36.    This unprecedented growth led to the successful sale of NAA to Envision in or around December 2018.

37.    After the sale to Defendant Envision, in addition to their full schedule as anesthesiologists at NYU, Drs. Schmigelski and Giuca had senior leadership and administrative roles as members of NAA's Management Committee.

38.     And, after Envision purchased NAA, Plaintiffs remained in senior leadership roles as they continued their roles on the Management Committee.

**Defendants Fail to Protect Plaintiffs During the COVID-19 Pandemic**

39.     As a member of Defendants' Management Committee, and a known clinical leader at NYU, Dr. Giuca was intimately involved at NYU (and nationally) on behalf of Defendants in developing clinical guidelines for treatment of COVID-19 patients.  Moreover, Defendant Envision asked Dr. Giuca to be one of the few expert authors of their COVID Clinical Manual to serve as a standard of care during COVID. This was written and distributed nationally during the pandemic and Dr. Giuca contributed to this while caring for patients and administrative duties during that time.  In addition, Dr. Giuca was instrumental in creating (and amending) Defendants' PPE guidelines specifically as they related to certain procedures with the high risk of COVID-19 spread.

40.     In particular, these guidelines required that all physicians and staff in a room where procedures were conducted that presented the highest risk of spread (i.e., skull base, sinus and airway procedures including tracheostomies) to wear Powered & Supplied Air Respiratory Protection ("PAPR") and/or a Controlled Air Purifying Respirator ("CAPR"), and in all other procedures to wear N-95 masks.

41.     These guidelines were prepared and updated based on then-current CDC and New York State guidance, as well as best practices to provide proper quality of patient care and mitigate the substantial and specific danger to public health and safety posed by the risk of spreading the COVID-19 virus.

42.     At the outset of the pandemic, NYU and Envision leadership, including the Envision Physician Clinical Team, supported these guidelines and agreed with Dr. Giuca and the team that prepared the best practice guidelines that procedures presenting the greatest risk should not be performed without PAPRs and/or CAPRs in order to protect the health and safety of Plaintiffs, physicians and staff, as well as the patients.

43.     Although Envision and NYU leadership paid lip service to protecting Plaintiffs and the other physicians, in practice they did not actually care for the health and safety of their physicians and patients.   Indeed, as early as the end of March 2020, NYU began asking Defendants' physicians to perform intubations without providing the appropriate protective equipment.

44.     And, in or around April 2020, another one of Defendants' physicians ("Dr. X")[1], who was then Defendants' Clinical Site Director at NYU, appointed by Dr. Joseph Greco (Senior Vice President, Chief of Hospital Operations & Associate Professor of Anesthesiology at NYU Winthrop Long Island School of Medicine), began to schedule tracheostomies without the required PAPRs and/or CAPRs, which was against policy and best patient care practices. In addition, Dr. X and Dr. Greco also insisted – incorrectly – that N-95 masks also were not needed.

45.     Plaintiffs objected to Dr. X's violation of Defendants' policies and practices, as well as his decision to risk the health and safety of physicians, staff and patients.  In addition, the Management Committee had numerous conversions with Dr. X where they asked him to do the right thing and support their requests for appropriate PPE to help protect the physicians, staff and patients.

---

[1]      Plaintiffs respectfully refer to Defendants' physician as "Dr. X" to avoid publishing his name in this litigation where he is not a party to this action.  However, his identity will be disclosed during discovery.

46.     On or about April 16, 2020, Plaintiffs brought their complaints regarding the failure to provide PAPRs and/or CAPRs to the other members of Defendants' Management Committee. In addition, Plaintiffs complained to Dr. Andrew Rosenberg, Chair of Anesthesia at NYU, about Dr. Greco's and Dr. X's decision to not require N-95 masks in the hospital.

47.     And, after Dr. X continuously ignored the Management Committee's requests to support their requests for appropriate PPE, by email dated April 16, 2020, the Management Committee asked Dr. X to tender his resignation as Clinical Site Director due to his failure to ensure the safety of Defendants' staff and his violations of Defendants' and national health and safety protocols and procedures.

48.     In response, Dr. X refused to tender his resignation and, instead, stated that his position as Clinical Site Director was appointed through Dr. Greco at NYU, and that the Management Committee would need to address their request through Dr. Greco to remove him from his appointment.

49.     Rather than taking any corrective action against Dr. X for his violations, Defendants and NYU supported Dr. X's continued role as Clinical Site Director and, instead, began to retaliate against Plaintiffs for their complaints about the grave health and safety risks posed by Dr. X's abuse of policies and best practices.

50.     By way of example only, on or about April 21, 2020, shortly after Plaintiffs' complaints and the day after the Management Committee requested Dr. X's resignation, Dr. X – as Defendants' employee who held the NYU-Winthrop appointed position of Clinical Site Director – summarily and publicly removed Dr. Giuca, without basis or notice and over the objection from other physicians at Defendants, from his leadership role as Director of

Preadmissions Testing ("PAT"), a program that Dr. Giuca structured and brought to NYU-Winthrop Hospital. Dr. Giuca was replaced by a clinician who had no previous involvement in a PAT clinic.

51. The retaliatory removal of Dr. Giuca from that position significantly damaged his career as the Director of PAT position is prolific both clinically and academically. For example, senior physicians in other areas of the NYU hospital system questioned Dr. Giuca about his unceremonious removal from this role, which impacted his standing inside and outside the hospital and damaged his reputation and career that he had spent more than ten years creating.

52. Defendants' unlawful misconduct caused significant embarrassment and severe emotional distress for Dr. Giuca.

53. There can be no question as to the motivation for the demotion. Dr. X specifically stated to Dr. John Moricco, Partner at Defendant NAA, that the decision to remove Dr. Giuca as Director of PAT was to teach him a lesson because he and Dr. Greco "were angry that [Dr. Giuca and the] management committee had sent Dr. X a letter asking him to step down from his position as Vice Chairman because [Dr. Giuca and the management committee] felt that he did not properly prioritize the safety of the members of our department in caring for Covid patients."

54. Dr. Giuca immediately complained about Dr. X's unlawful retaliation to Dr. Steven Topfer, Executive Vice President of Defendant Envision, and Meghan Roberts, Human Resources Director at Defendant Envision. Specifically, Dr. Giuca sent them emails highlighting the fact that Dr. X admitted that the demotion was to "teach him a lesson" and that he was being

punished because he was "in a position to help protect our whole staff and that viewpoint is not shared by the institution (NYU) or our liaison (Dr. X)."

55.     Dr. Giuca's complaints about this unlawful retaliation fell on deaf ears.  Not only did Defendants and Dr. Topfer at NYU do nothing to remediate either the egregious health and safety risks or the unlawful retaliation, but they instead rewarded Dr. X with a promotion to the "Management Team," a newly formed entity made by, and reporting to, Dr. Topfer, in an effort to appease Dr. Greco and NYU.

56.     In a further defiant act of retaliation, on a conference call with the newly formed "Management Team," Dr. Topfer belittled Dr. Giuca's PAT Program and diminished its value. This conference call was set up by Dr. Topfer and he spent the time ingratiating himself to Dr. X at the expense of Dr. Giuca.  This further empowered Dr. X, and effectively put Defendants' pocketbook ahead of the health and safety of their employees and patients.

57.     Similarly, Dr. X retaliated against Dr. Schmigelski.  Specifically, in or around the end of March 2020, when the number of COVID-19 patients being treated at NYU blossomed to emergency levels, Dr. X falsely told Dr. Greco that Dr. Schmigelski would not allow an emergency intubation team to conduct intubations until a written contract was signed, as this procedure was not part of Defendants' role at NYU.

58.     This false narrative created by Dr. X out of whole cloth substantially damaged Dr. Schmigelski's reputation internally at Defendants and externally at NYU, as it made him appear not to agree to take important action during the early surges in the pandemic.  And, in a sign of solidarity with Dr. X, on or about April 30, 2020, Dr. Topfer tried to elevate Dr. X to Defendants' Management Committee.

59.    In addition, Defendants continued to allow Dr. X to put the health and safety of Defendants' physicians, as well as their patients, in jeopardy by telling physicians not to wear PAPRs and/or CAPRs during risky procedures such as bronchoscopies and tracheostomies, in violation of Defendants' policies and best care practices.  Indeed, when Plaintiffs refused to perform these procedures without the required PAPRs and/or CAPRs, the cases had to be cancelled, and Dr. X again falsely attempted to blame Plaintiffs for the cancelled procedures.

60.    In light of this unlawful mistreatment and failure to remedy this misconduct, Dr. Giuca was left with no choice other than to resign his position at the Hospital and with Defendants on or about May 22, 2020.

61.    Dr. X's and Dr. Topfer's retaliation did not end after Dr. Giuca's resignation. Indeed, Dr. X falsely told other partner-level physicians at Defendants that Dr. Giuca was going to work at Northwell-Southside Hospital ("Southside") – which was not true – and Dr. Topfer threatened that Dr. Giuca "is going nowhere," which subsequently was repeated by Dr. X.

62.    Dr. Topfer's tactical dissemination of false information was designed to further damage Dr. Giuca's reputation because former physicians within Defendants had left Defendants in the past to work at Southside, and the false perception that Dr. Giuca was making a similar move – which never even was contemplated by Dr. Giuca – was incendiary to the other physicians, partners and leadership at Defendants.

63.    Indeed, Dr. Giuca actually had signed an employment agreement with another hospital within the Northwell family of facilities outside of any restricted areas under his agreements with Defendants.

64.     Nevertheless, Dr. Giuca was forced to withdraw due to the continued and baseless threats of litigation, notwithstanding the fact that he did nothing wrong.

65.     Indeed, the Chief of Northwell Anesthesiology explained to Dr. Giuca that he had heard that Envision threatened litigation if Dr. Giuca went to work there, and that Northwell did not want to be in the middle of any potential litigation.

66.     This is consistent with the concurrent statement by Dr. Gilbert Drozdow, Defendant Envision's Chief Clinical Officer, to Dr. Schmigelski threatening that Defendants would not let Dr. Giuca move on from Envision without litigation.

67.     Moreover, in an apparent effort to set up Dr. Giuca to appear that he missed an assigned shift at the Hospital, Dr. Topfer continued to direct Dr. Schmigelski to place Dr. Giuca on the schedule, notwithstanding the fact that Dr. Topfer knew that Dr. Giuca already had resigned.

68.     Dr. Giuca reported this transparent attempt by Dr. Topfer to further publicly tarnish Dr. Giuca's reputation in the Hospital to Ms. Roberts in her role as Director of Human Resources. This complaint again fell on deaf ears as nothing was done by Defendants to discipline Dr. Topfer's continued unlawful retaliatory misconduct.

69.     Unable to work at Northwell, Dr. Giuca – who had to go on medical leave to treat an illness that was exacerbated by his unlawful mistreatment – attempted to continue working at NYU-Winthrop Hospital in a reduced capacity to accommodate his disability.  Indeed, the Dean of Long Island School of Medicine and other leaders at NYU-Winthrop Hospital attempted to accommodate Dr. Giuca's need for a reduced schedule working in part at the medical school

(which Dr. Giuca helped create and where he successfully has held many leadership positions during his tenure at NYU-Winthrop Hospital).

70.     However, Dr. Topfer and Dr. X interfered with this accommodation from happening.  Indeed, Dr. X even went as far as telling the Dean of Long Island School of Medicine that Dr. Giuca was not allowed to return to NYU-Winthrop Hospital, and the Dean explained to Dr. Giuca that there was nothing he could do, and that he could not be directly involved with the situation.  This unlawful retaliation by Drs. Topfer and X irreparably tarnished Dr. Giuca's reputation that he had spent decades building.

71.     Once again, Dr. Giuca reported this misconduct to Ms. Roberts by email dated August 3, 2020, which fell on deaf ears.  Indeed, the only proposed result that would not invite Defendants to threaten litigation was for Dr. Giuca to accept another position at a hospital in New London, Connecticut, still working under Defendant Envision's umbrella of medical practices.  As such, Dr. Giuca remained employed by Defendant Envision at reduced compensation levels, and in a location that required him to uproot his family and move across state lines.

72.     Rather than taking appropriate corrective action, on or about August 31, 2020, Defendants further retaliated against Plaintiffs by reducing their paid time off, which was an additional breach of Plaintiffs' employments agreements with Defendants that expressly guaranteed Plaintiffs to twelve (12) weeks of paid time off (or payment in lieu of taking any such time).

73.     In addition, not only was this new position at the hospital in New London, Connecticut not Dr Giuca's choice (as well as resulting in a reduction in his compensation from

NYU-Winthrop Hospital), but Defendants actually paid Dr. Giuca less in base salary, less in annual retention bonuses, and less in stipends than it paid its newly hired physicians located there.  In addition, another physician who also had to relocate to Connecticut to work at the same hospital in New London as Dr. Giuca received from Defendant Envision reimbursement of her relocation expenses and a stipend, neither of which were provided by Defendants to Dr. Giuca.

74.     Dr. Topfer also retaliated against Dr. Schmigelski for his complaints about the risks created by Defendants' and NYU's violations of best health and safety practices and Defendants' policies.  Indeed, in or around June 2020, Dr. Topfer – without prior notice or any legitimate justification – summarily removed Dr. Schmigelski from his role as Chief of Defendant NAA, a position that he held for more than a year and a half.

75.     Subsequently, the position of Regional Medical Director – which would have been a promotion awarded to Dr. Schmigelski (and which had been promised to Dr. Schmigelski by Dr. Topfer) had Dr. Topfer not retaliated against him by removing his Chief position – was awarded to Dr. Hadas Reshef, another anesthesiologist in the group who was not part of the leadership team during and after Defendant Envision's purchase of Defendant NAA.   In acknowledgement of this fact, Dr. Reshef stated that he did not understand why he was awarded this prestigious role.  As such, it is clear that Defendants' retaliation against Dr. Schmigelski destroyed the upward trajectory in his career both in terms of prestige and compensation.

**Defendants Breach Plaintiffs' Employment Agreements and Make Unlawful Deductions From Plaintiffs' Earned Wages In Violation Of New York Labor Law**

76.     As part of Defendant Envision's purchase of Defendant NAA's assets in or around December 2018, Plaintiffs each were required to enter into nearly identical written employment agreements with Defendants (the "Agreements") governing the terms and

conditions of their continued employment from December 18, 2018 through December 23, 2023, with a unilateral option for Plaintiffs to extend the term for an additional three (3) years through December 23, 2026.

77.     Among other things, the Agreements explicitly set Plaintiffs' base compensation for the term of the Agreements, providing that "Clinician shall be paid an annual base salary in the amount of Four Hundred Thirty-Nine Thousand Five Hundred Dollars $439,500 (the "Base Compensation")." Indeed, nothing in the Agreements provided Defendants with any discretion to make any deductions from Plaintiffs' wages.

78.     The Agreements also provided for a 401(k) contribution, expense allowance, bonus pool payments and paid time off, entitling Plaintiffs "to accrue twelve (12) weeks paid time off ("PTO") to be used for such purposes as vacation, sick time, personal days, and continuing education days during each calendar year."

79.     On or about April 5, 2020, Defendants, without prior notice or any legal or contractual right or basis, informed Plaintiffs that Defendants were unilaterally deducting 30% of Plaintiffs' base salaries through May 30, 2020, after which Defendants unilaterally deducted 15% from Plaintiffs' base salaries through June 27, 2020, notwithstanding the fact that Defendants had no legal or contractual basis to deduct any amount from Plaintiffs' contractually guaranteed wages.

80.     These improper and unauthorized deductions from Plaintiffs' base compensation represent a blatant breach of the Employment Agreements, which clearly establish that Defendants "shall pay" Plaintiffs their contractually set wages, as well as a violation of the New York Labor Law.

81.     In response, by letter dated April 9, 2020, Dr. Giuca wrote to Dr. Steven Scheinman, President of Envision, declaring that the unilaterally announced deductions from his base salary were unlawful, stating "I recently received notification of a salary decrease that will last for an extended period of time despite all of the work that I am performing under stressful and dangerous conditions.  This is a breach of contract and I do not feel it is acceptable."

82.     Similarly, by letter dated April 10, 2020, Dr. Schmigelski wrote to Dr. Scheinman, complaining about the unlawful deductions from his base salary, stating that "by decreasing salaries, the Company is in breach of my Employment Agreement and those of the other call-taking physicians."

83.     Rather than taking any corrective measures to cure their breach, by letter dated April 14, 2020, from Dr. Andrew Greenfield, President, Anesthesia Services, Defendants restated that "the company has made the very difficult decision to implement changes to your compensation."

84.     And, in a nefarious effort to somehow trick Plaintiffs (and the other physicians affected by this breach of contract and violation of New York Labor Law) into waiving their legal claims for this misconduct, Dr. Greenfield's letter also stated "[i]f you continue working with modified pay, we will consider that your acceptance of these terms."

85.     Although Defendants subsequently changed this effort to covertly create some condonation type defense to their known liability for their misconduct after Plaintiffs and others complained about it, Defendants did nothing to rectify their breaches and violations of New York Labor.

86.     Indeed, Defendants' deductions from Plaintiffs' contractually earned wages resulted in unlawful deductions of approximately $25,355 from each of Plaintiffs' earned wages. Plaintiffs duly and timely performed all of their obligations under the Agreements.

87.     Defendants did not have any good faith basis to make these deductions from Plaintiffs' earned wages.  Defendants' breach of contract and violations of New York Labor Law were especially egregious during  a period when Plaintiffs (and Defendants' other physicians) were working extra shifts and under considerably more stress by "walking into the fire and exposing [themselves] to COVID, particularly during the intubation process."

88.     As a further breach of Plaintiffs' Employment Agreements, Defendants failed to contribute their contractually guaranteed $5,500 contribution to their 401(k) accounts or increase their salaries to compensate for these breaches.

**Defendants Retaliate Against Plaintiffs For Their Complaints About Dr. X's Sexist, Racist And Otherwise Discriminatory Misconduct And Their Participation In Defendants' Purported Investigation Of Such Misconduct**

89.     Dr. X not only violated Defendants' health and safety policies and protocols, but he also engaged in unlawful racist, sexist and otherwise unlawful behavior against other employees at the Hospital.  And, when Plaintiffs complained about Dr. X's unlawful behavior, Defendants further retaliated against them, effectively ending their careers with Defendants.

90.     By way of example only, as early as February 26, 2020, Dr. X sent an email to the Management Committee regarding an interview he had with a physician looking for a potential job with Defendants.  The candidate appeared at the interview with Dr. X apparently wearing

religious clothing.  Specifically, Dr. X's email stated, in part, "I met with Dr. Y[2] yesterday.  He presented himself with the full Russian Orthodox Deacon regalia to the interview (while I appreciate Dr. Y's dedication to his faith, this is a civilian position and it does take a different mind set to come to an interview in this type of ensemble). . . . We should put him on the back burner for now."

91.     This email clearly demonstrates Dr. X's discriminatory bias to deny Dr. Y a position with Defendants based on his religion and/or religious beliefs.

92.     Uneasy with Dr. X's explicitly discriminatory behavior, Plaintiffs each immediately sent an email to Dr. Topfer complaining about Dr. X's discriminatory email and describing the need to address this unlawful conduct.  Indeed, on or about February 26, 2020, Plaintiffs told Dr. Topfer, as Executive Vice President of Defendants, that they needed to speak that day about bringing Dr. X's alleged misconduct to Envision's human resources department.

93.     Dr. Topfer did not respond to Plaintiffs' demand to report the misconduct to human resources, and Defendants took no steps to address this unlawful misconduct and, instead, permitted Dr. X to continue working with impunity.

94.     Not surprisingly, Dr. X's unlawful misconduct did not stop there.  Indeed, in or around July 2020, a female employee in NYU's operating room ("OR") contacted the members of Defendants' Management Committee to complain about Dr. X's verbal harassment and bullying, which she alleged had been going on for a long time.  This OR employee also indicated

---

[2]     Plaintiffs respectfully refer to the interviewing physician as "Dr. Y" to protect his identity, as he is not a party to this action.  However, his identity will be disclosed during discovery.

that she was going to file a formal complaint with NYU's human resources department, but feared reprisal from Dr. X.

95.     When a member of the Management Committee attempted to speak with Dr. X by telephone about the allegations, Dr. X refused to speak about the situation and hung up on the Management Committee member.

96.     Concerned about the continued abuse and unlawful misconduct by Dr. X, the Management Committee advised Dr. Topfer, Ms. Roberts and Beth Gruber, Senior Director Human Resources, about Dr. X's gross misconduct, including the fact that Dr. X refused to speak with the Management Committee about his behavior.  And, on or about August 1, 2020, Dr. Schmigelski sent a follow-up email to Dr. Topfer, Ms. Roberts and Ms. Gruber concerning the complaint against Dr. X and informing them that the victim was a member of the union and that Dr. Schmigelski was informed that she already had filed a formal complaint to her union representative.

97.     Although Defendants scheduled a conference call to discuss Dr. X's misconduct, upon information and belief, nothing was done to discipline Dr. X or alter his behavior.

98.     Indeed, Dr. X's unlawful behavior continued unabated.

99.     By way of example only, on or about February 14, 2021, Dr. X questioned Dr. Ronita Mukherjee, after she had requested time off to care for her child, why female physicians ask for time off to be home taking care of their children.  This misogynistic stereotype has no place in the workforce, let alone towards a physician risking her health and safety every day at NYU Hospital treating patients affected by COVID-19 and other serious ailments.

100.    By way of further example, in or around January 2020, Dr. X texted an opinion piece published in the New York Times to Dr. Armando D'Arduini, another member of the Management Committee who is of Italian dissent, entitled "How Italians Became 'White."

101.    Shocked at Defendants' lack of action in response to Dr. X's unlawful misconduct, on or about December 22, 2020, Dr. Schmigelski once again complained to Ms. Roberts, in writing, about Dr. X's harassment and retaliatory misconduct, including the fact that Defendants had performed no investigation into his complaints and that no action had been taken by Defendants to address Dr. X's unlawful misconduct (much of which was reiterated in Dr. Schmigelski's December 22 email).  Dr. Schmigelski also questioned Defendants' failure to act in light of its purported Diversity, Equality & Inclusion policy.

102.    Moreover, Dr. Schmigelski's email complained about Dr. X's unlawful retaliation in removing him from one of his leadership positions at NYU Hospital, and demanded that he be returned to this position and that he expected all forms of retaliation to cease.

103.    Once again, Dr. Schmigelski's complaints fell on deaf ears.  Rather than taking any corrective action, Defendants continued to permit Dr. X to act without consequence.

104.    To the contrary, in response to Dr. Schmigelski's complaints, on or about November 13, 2020, while Dr. Schmigelski was out on approved FMLA leave – and in furtherance of his pattern of unlawful retaliation against Dr. Schmigelski – Dr. X removed Dr. Schmigelski from his new role as Lead Anesthesiologist of the Electrophysiology Lab ("EP Lab") at NYU-Winthrop Hospital, and replaced him with another physician who had no experience in the EP Lab.  Indeed, there was no bona fide business justification to remove and

replace Dr. Schmigelski.  Rather, it was in retaliation for the complaints he has raised against Dr. X and his unlawful misconduct.

105.   Due to the nature of this leadership position, Dr. Schmigelski's career was on an upwards trajectory within NYU-Winthrop Hospital and within the community of anesthesia practitioners.  However, Dr. X's retaliatory decision to summarily remove Dr. Schmigelski from Lead Anesthesiologist of the EP Lab significantly damaged his career prospects both within and outside of NYU-Winthrop Hospital.

106.   In addition, on or about December 18, 2020, Dr. X sent Dr. Schmigelski a harassing and derogatory email, in retaliation for Dr. Schmigelski multiple complaints about Dr. X's unlawful misconduct.  Dr. X's email – which was sent to numerous physicians working for Defendants – publicly belittled Dr. Schmigelski for sending an email seeking amounts owed by each of the physician's contributions towards Defendant NAA's cash balance plan.

107.   After seeing that Defendants did nothing to address his complaints and continuing to being victim to retaliation, Dr. Schmigelski filed another complaint on or about January 3, 2021, in an email to Ms. Gruber, demanding an investigation into the harassment and retaliation by Dr. X and others for his prior complaints against Dr. X.

108.   As part of this complaint, Dr. Schmigelski sent a copy of the opinion that Dr. X sent to Dr. D'Arduini from the New York Times.  Upon information and belief, Defendants' human resources department was aware of Dr. X sending this article for several weeks but failed to take any action.

109.    Left without any options to regain his reputation and stop the unlawful mistreatment, on or about January 16, 2021, Dr. Schmigelski also raised his complaint with Jim Rechtin, President and Chief Executive Officer of Defendant Envision.   Specifically, Dr. Schmigelski informed Mr. Rechtin that he (and others) provided documentation of Dr. X's racism, harassment and retaliation, as well as the fact that his position of Chief had been stripped in response to his multiple complaints.

110.    After Dr. Schmigelski filed his complaint with Mr. Rechtin (and more than 11 months after Plaintiffs each began complaining about Dr. X's unlawful misconduct), Defendants hired an outside law firm, Ogletree, Deakins, Nash, Smoak & Stewart, P.C. ("Ogletree") purportedly to conduct an investigation into Plaintiffs' complaints regarding Dr. X's unlawful misconduct.

111.    As part of the "investigation," Defendants' lawyers from Ogletree questioned Plaintiffs about the allegations raised in Plaintiffs' numerous complaints, including Dr. Schmigelski's formal complaints in January 2021.   In response to Ogletree's interrogation, Dr. Schmigelski provided numerous examples of Dr. X's unlawful discriminatory and retaliatory misconduct, and furnished a number of documents to Defendants' lawyers to support his claims.

112.    Notwithstanding the fact that Defendants maintain non-retaliation policies, and the fact that human resources employees and the Ogletree lawyers repeatedly promised Dr. Schmigelski that Defendants have a zero-tolerance policy for retaliation, he almost immediately was removed from the distribution of Defendant NAA's daily work schedule email on or about January 20, 2021.   Indeed, prior to this time, Dr. Schmigelski was integrally involved in

scheduling the physicians' work shifts and had received the daily schedule since his employment began at Defendant NAA.

113.    Upon information and belief, Dr. Schmigelski was removed from this daily distribution by Dr. X and Dr. Reshef because of his complaints about Dr. X's misconduct.  And, because Dr. Topfer also needed to approve Dr. Schmigelski's removal from this list, Dr. Schmigelski filed a formal complaint with Defendants' human resources against Dr. Topfer on or about January 28, 2021.

114.    Dr. Giuca also participated in Defendants' "investigation" of Dr. X's unlawful misconduct.

115.    Even though Dr. Giuca had been working for Defendant Envision at the hospital in New London, Connecticut – over his reluctance to participate due to the damage he already had suffered in retaliation for his underlying complaints – the Ogletree lawyers questioned Dr. Giuca at length.

116.    In response, Dr. Giuca also explained numerous instances of the unlawful discriminatory and retaliatory misconduct perpetrated by Dr. X against himself and others. Although the Ogletree lawyers advised Dr. Giuca that he would not be subjected to retaliation for his participation, as recently as April 29, 2021, in an obvious attempt to further intimidate Dr. Giuca, he was asked to relocate to Florida.

117.    The following day, April 30, 2021, Dr. Giuca was informed by Defendant Envision's Regional Medical Director that Defendants cancelled Dr. Giuca's privileges with NYU Hospital (even though they were not set to expire until the end of July), and have made

clear that there is no position for him there despite the fact that the Dean of Long Island School of Medicine and other leaders at NYU-Winthrop Hospital attempted to bring Dr. Giuca back to work a reduced schedule at the medical school located there.

118.    The "investigation" conducted by Ogletree took several months to complete. Indeed, it was not until on or about March 25, 2021, that the Ogletree lawyers reported back to Dr. Schmigelski that their purported investigation had been completed.   And, although the Ogletree lawyers claimed that corrective action was taking place and that Dr. Schmigelski would not be subject to retaliation, it appears that this is not the case.

119.    Indeed, although Dr. X is no longer working for Defendants, upon information and belief, Defendants worked with NYU-Winthrop Hospital to secure him a position directly with the hospital to avoid damaging their business relationship.   In addition, upon information and belief, as part of this covert agreement, Defendants failed to disclose to NYU-Winthrop Hospital the reasons why Dr. X was no longer working for Defendants.

120.    Similarly, although Dr. Topfer no longer is Defendant Envision's liaison with Defendant NAA, he remains an Executive Vice President at Defendant Envision and, upon information and belief, has been reassigned to the same role with another medical group owned and operated by Defendant Envision.

**Defendants Fail To Engage In The Interactive Process Or Offer Plaintiffs Reasonable Accommodations For Their Disabilities**

121.    In or around September 2020, Dr. Schmigelski was diagnosed with bilateral CTS and bilateral Cervical Radiculopathy, which forced him to go on an approved leave pursuant to

the Family and Medical Leave Act ("FMLA") from September 7, 2020 through November 29, 2020.

122.    Due to his continued symptoms, towards the end of his FMLA leave, Dr. Schmigelski requested additional medical leave to treat his disability through January 4, 2021. Defendants approved Dr. Schmigelski's request.

123.    On or about December 26, 2020, when Dr. Schmigelski's symptoms from his disability had not improved, he requested an accommodation of an additional three months of medical leave, through April 4, 2021.  The total length of this requested leave was less than at least one other similarly situated physician working for Defendants.

124.    However, rather than granting the request for additional medical leave – or even asking for additional or more specific medical information or records – Defendants denied Dr. Schmigelski's request at 5:45 pm on or about December 31, 2020 (the day of New Year's Eve).

125.    In response to Dr. Schmigelski's complaint of the denial of this accommodation as being retaliatory in response to his complaints about Dr. X, Ms. Gruber stated that Defendants' "Leaves" department does not handle requests for medical leaves of absence and that human resources, the group that handles such requests, allegedly was not aware of Dr. Schmigelski's request for this accommodation.

126.    Ms. Gruber's contention was patently false, as human resources was copied on all of Dr. Schmigelski's correspondence with the "Leaves" department in connection with his requests for accommodation.

127.     Following Dr. Schmigelski's complaint, on or about January 7, 2021, and without any further request for information, Ms. Gruber notified Dr. Schmigelski that his request had been denied and that Defendants required Dr. Schmigelski to undergo an independent medical examination from a physician selected by Defendants.

128.     The following day, Dr. Schmigelski furnished Defendants' ADA questionnaire completed by his neurologist supporting his need for an accommodation of extended medical leave.

129.     Rather than engaging in the interactive process to determine whether Defendants can provide a reasonable accommodation for Dr. Schmigelski's disabilities, on or about January 15, 2021, Ms. Gruber once again rejected Dr. Schmigelski's request for medical leave and scheduled an appointment for Dr. Schmigelski for an independent medical examination with a physician selected by Defendants.

130.     In response, Dr. Schmigelski complained that Defendants' conduct was retaliatory and in violation of his rights under the laws against disability discrimination.

131.     Although Defendants' internal legal counsel agreed with Dr. Schmigelski that an independent medical examination was not necessary, Defendants required Dr. Schmigelski to furnish additional information from his neurologist regarding his requested medical leave.

132.     As set forth above, Dr. Topfer and Dr. X interfered with the potential accommodation offered to Dr. Giuca by the Dean of the Long Island School of Medicine for a reduced schedule working in part at the medical school.  After this interference, Dr. Giuca was forced to leave Envision to secure another position that permitted him to be out of the operating

room 50% of the time as Director of PAT and working with medical students and residents, an accommodation that Defendants could have and should have offered Dr. Giuca.

133.   Defendants' misconduct was knowing, malicious, willful and wanton and/or showed a reckless disregard for Plaintiffs and their civil rights in violation of Federal and New York State human rights laws.

134.   As a direct and proximate result of Defendants' unlawful misconduct, Plaintiffs have suffered, and continue to suffer, monetary and/or economic damages, including but not limited to, loss of past and future income, compensation and benefits for which they are entitled to an award of damages.

135.   As a direct and proximate result of Defendants' unlawful misconduct, Plaintiffs have suffered, and continue to suffer, loss of career fulfillment and harm to their careers as well as their professional and personal reputations.

136.   As a direct and proximate result of Defendants' misconduct, Plaintiffs have suffered, and continue to suffer, severe mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering for which they are entitled to an award of damages.

## AS AND FOR A FIRST CAUSE OF ACTION
**(Breach of Contract)**

137.    Plaintiffs repeats and realleges each of the allegations contained in paragraphs 1 through 136 above with the same force and effect as though fully set forth herein.

138.    The Agreements are valid and binding contracts.

139.    Plaintiffs duly and timely performed all of their obligations under the Agreements.

140.    Defendants materially breached the Agreements by wrongfully and unilaterally deducting 30% of Plaintiffs' base salaries from April 5, 2020 through May 30, 2020, after which Defendants unilaterally deducted 15% from Plaintiffs' base salaries through June 27, 2020, failing to contribute their contractually guaranteed $5,500 contribution to their 401(k) accounts or increase their salaries to compensate for these breaches, and reducing their paid time off, which were the agreed upon benefits due and owing to Plaintiffs.

141.    As a direct result of Defendants' material breach of contract, Plaintiffs suffered, and continue to suffer, substantial damages in an amount to be determined at trial.

## AS AND FOR A SECOND CAUSE OF ACTION
**(Violation of New York Labor Law § 193)**

142.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 141 above with the same force and effect as though fully set forth herein.

143.     At all relevant times, Plaintiffs were "employees" within the meaning of the New York Labor Law.  Similarly, at all relevant times, Defendants were and are "employers" within the meaning of the New York Labor Law.

144.     As previously alleged, Defendants were contractually obligated to confer and provide the agreed upon base salary payments to Plaintiffs.

145.     Notwithstanding the foregoing, Defendants unilaterally and unlawfully deducted 30% of Plaintiffs' base salaries from April 5, 2020 through May 30, 2020, after which Defendants unilaterally deducted 15% from Plaintiffs' base salaries through June 27, 2020.

146.     Plaintiffs' base salary payments constitute "wages" within the meaning of the New York Labor Law §§ 190 et seq.

147.     Defendants willfully, intentionally and deliberately made unlawful deductions from the wage payments owed to Plaintiffs, despite their demand for payment of such wages, in violation of New York Labor Law § 193.

148.     As a result of the foregoing, Plaintiffs have been denied wages required under New York Labor Law §§ 190 et seq., and are entitled to an award of unpaid wages, liquidated damages as well as the attorneys' fees and costs incurred in this matter.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Retaliation In Violation of New York Labor Law § 215)

149.     Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 148 above with the same force and effect as though fully set forth herein.

150.    Plaintiffs complained to Defendants within the meaning and scope of Section 215 of the NYLL in or around April 2020 alleging violations of the NYLL.

151.    As set forth above, Defendants retaliated against Plaintiffs for their protected complaints  in violation of Section 215 of the NYLL.

152.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of NYLL § 215, Plaintiffs have suffered, and continue to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which they are entitled to an award of monetary damages and other relief.

153.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYLL, Plaintiffs have suffered mental anguish and emotional distress for which they are entitled to an award of monetary damages and other relief.

154.    Defendants' conduct was intentional, knowing, malicious, willful and in bad faith, which warrants an award of liquidated damages.

155.    Due to Defendants' violations of the NYLL, Plaintiffs are entitled to recover from Defendants their reasonable attorneys' fees and costs of the action, together with prejudgment and post judgment interest.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Violations of New York Labor Law § 741)

156.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 155 above with the same force and effect as though fully set forth herein.

157.    Defendants engaged in protected activity when they complained to Defendants' senior management about what they reasonably believed to be improper quality of patient care and improper quality of workplace safety.

158.    Plaintiffs documented the fact that Defendants engaged in conduct which seriously endangered the health of themselves, other staff members and their patients in violation of relevant protocols and in a manner that subjected them and others to unnecessary health and safety risks.

159.    No action was taken by Defendants to remedy these violations of protocols and health and safety risks, which created a substantial and specific danger to Plaintiffs, other staff, patients and the public.

160.    As set forth above, Defendants retaliated against Plaintiffs for their engagement in these protected activities in violation of NYLL § 741.

161.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of NYLL § 741, Plaintiffs have suffered, and continue to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which they are entitled to an award of monetary damages and other relief.

162.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYLL, Plaintiffs have suffered mental anguish and emotional distress for which they are entitled to an award of monetary damages and other relief.

163.    Defendants' conduct was intentional, knowing, malicious, willful and in bad faith, which warrants an award of liquidated damages.

164.     Due to Defendants' violations of the NYLL, Plaintiffs are entitled to recover from Defendants their reasonable attorneys' fees and costs of the action, together with prejudgment and post judgment interest.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Tortious Interference with Contract)

165.     Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 164 above with the same force and effect as though fully set forth herein.

166.     After being forced to resign from his role at Defendants, in or around May 2020, Dr. Giuca signed an employment agreement with another hospital within the Northwell family of facilities outside of any restricted areas under his agreements with Defendants.

167.     Defendants had knowledge of such contract and, as set forth above, intentionally interfered with such relationships through, upon information and belief, threats of litigation without basis or justification.

168.     Defendants, through Dr. Topfer, intentionally interfered with such contract for wrongful purposes, by wrongful means and by wrongful methods.

169.     Such interference directly and proximately caused the Northwell hospital to back away from employing Dr. Giuca and directly caused Dr. Giuca to withdraw from the signed agreement.

170.     Defendants permanently harmed Dr. Giuca's employment relationship and caused him to suffer damages, including but not limited to the following:  (a) loss of compensation and financial harm, including lost income and profit; (b) harm to Dr. Giuca's career development in the industry; (c) harm to Dr. Giuca's professional and personal reputations; and (d) severe mental anguish and emotional distress, including but not limited to,

loss of self-esteem and self-confidence, loss of career fulfillment, and continual stress, anxiety and uncertainty over his career and ability to meet his financial obligations.

171.    As a direct and proximate result of Defendants' unlawful and tortious conduct, Dr. Giuca has suffered, and continues to suffer, harm for which he is entitled to an award of monetary damages (including, but not limited to, economic and compensatory damages) and other relief, in an amount to be determined at trial.

172.    Defendants' misconduct was intentional, willful, wanton and malicious, and was motivated solely by ill-will and a desire to harm Dr. Giuca and/or a deliberate or reckless disregard for his well-being, for which Dr. Giuca is entitled to an award of punitive damages.

### AS AND FOR A SIXTH CAUSE OF ACTION
**(Tortious Interference with Prospective Business Advantage/Relations)**

173.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 172 above with the same force and effect as though fully set forth herein.

174.    After being forced to resign from his role at Defendants, in or around May 2020, Dr. Giuca had a prospective business relationship with another hospital within the Northwell family of facilities outside of any restricted areas under his agreements with Defendants.

175.    Defendants had knowledge of such prospective business relationship and, as set forth above, intentionally interfered with such relationships through, upon information and belief, threats of litigation without basis or justification.

176.    Defendants, through Dr. Topfer, intentionally and directly interfered with such prospective business relationship trough dishonest, unfair and improper means, and was motivated solely by a desire to harm Dr. Giuca for wrongful purposes.

177.    Such interference directly and proximately caused the Northwell hospital to back away from employing Dr. Giuca and directly caused Dr. Giuca to withdraw from the

signed agreement, and interfered with Dr. Giuca's advantageous prospective business relationship with the Northwell hospital.

178.    Defendants permanently harmed Dr. Giuca's prospective business relationship with the Northwell hospital and caused him to suffer damages, including but not limited to the following:  (a) loss of compensation and financial harm, including lost income and profit; (b) harm to Dr. Giuca's career development in the industry; (c) harm to Dr. Giuca's professional and personal reputations; and (d) severe mental anguish and emotional distress, including but not limited to, loss of self-esteem and self-confidence, loss of career fulfillment, and continual stress, anxiety and uncertainty over his career and ability to meet his financial obligations.

179.    As a direct and proximate result of Defendants' unlawful and tortious conduct, Dr. Giuca has suffered, and continues to suffer, harm for which he is entitled to an award of monetary damages (including, but not limited to, economic and compensatory damages) and other relief, in an amount to be determined at trial.

180.    Defendants' misconduct was intentional, willful, wanton and malicious, and was motivated solely by ill-will and a desire to harm Dr. Giuca and/or a deliberate or reckless disregard for his well-being, for which Dr. Giuca is entitled to an award of punitive damages.

### AS AND FOR A SEVENTH CAUSE OF ACTION
**(Retaliation In Violation of Title VII)**

181.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 180 above with the same force and effect as though fully set forth herein.

182.    By the actions described above, Defendants retaliated against Plaintiffs in violation of Title VII by subjecting them to adverse personnel actions, compensation decisions and, as it related to Dr. Giuca to the separation of his employment from Defendants, in retaliation for their complaints about unlawful discrimination and their participation in an "investigation"

into such unlawful discrimination, and their subsequent complaints about unlawful retaliation, which Plaintiffs believed in good faith represented a violation of law.

183.   As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Title VII, Plaintiffs have suffered, and continue to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits, for which they are entitled to an award of damages and other relief.

184.   As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Title VII, Plaintiffs have suffered and continue to suffer mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which they are entitled to an award of monetary damages and other relief.

185.   Defendants' unlawful retaliatory conduct in violation of Title VII was willful, wanton, outrageous and malicious, and was done with conscious disregard of Plaintiffs' civil rights, entitling them to an award of punitive damages.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### (Retaliation In Violation of NYSHRL)

186.   Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 185 above with the same force and effect as though fully set forth herein.

187.   By the actions described above, Defendants retaliated against Plaintiffs in violation of NYSHRL by subjecting them to adverse personnel actions, compensation decisions and, as it related to Dr. Giuca to the separation of his employment from Defendants, in retaliation for their complaints about unlawful discrimination and their participation in an "investigation"

into such unlawful discrimination, and their subsequent complaints about unlawful retaliation, which Plaintiffs believed in good faith represented a violation of law.

188.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of NYSHRL, Plaintiffs have suffered, and continue to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits, for which they are entitled to an award of damages and other relief.

189.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of NYSHRL, Plaintiffs have suffered and continue to suffer mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which they are entitled to an award of monetary damages and other relief.

190.    Defendants' unlawful retaliatory conduct in violation of NYSHRL was willful, wanton, outrageous and malicious, and was done with conscious disregard of Plaintiffs' civil rights, entitling them to an award of punitive damages.

### AS AND FOR A NINTH CAUSE OF ACTION
**(Failure to Accommodate under the ADA)**

191.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 190 above with the same force and effect as though fully set forth herein.

192.    Plaintiff each suffered from a disability, was perceived as suffering from a disability, and/or had a record of a disability as defined by the ADA.

193.    By the actions described above, Defendants failed to make reasonable accommodations to Plaintiffs' known disabilities by, *inter alia*, failing to accommodate (i) Dr. Giuca's need for a reduced schedule working in part at the medical school (which Dr. Giuca helped create and where he successfully has held many leadership positions during his tenure at NYU-Winthrop Hospital) both while Dr. Giuca was working for Defendants at NYU-Winthrop Hospital and while he was working at the New London hospital, and (ii) Dr. Schmigelski's need for additional medical leave to treat his disabilities.

194.    As a direct and proximate result of Defendants' willful, malicious, outrageous, and/or recklessly indifferent and unlawful conduct in violation of the ADA, Plaintiffs have suffered, and continue to suffer, harm for which they are entitled to an award of damages to the greatest extent permitted by law, including, but not limited to, economic damages for past and future lost wages, compensatory damages for emotional harm and punitive damages.

## AS AND FOR A TENTH CAUSE OF ACTION
### (Failure to Accommodate under NYSHRL)

195.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 194 above with the same force and effect as though fully set forth herein.

196.    Plaintiffs each suffered from a disability, was perceived as suffering from a disability, and/or had a record of a disability as defined by the NYSHRL.

197.    By the actions described above, Defendants failed to make reasonable accommodations to Plaintiffs' known disabilities by, *inter alia*, failing to accommodate (i) Dr. Giuca's need for a reduced schedule working in part at the medical school (which Dr. Giuca helped create and where he successfully has held many leadership positions during his tenure at

NYU-Winthrop Hospital) both while Dr. Giuca was working for Defendants at NYU-Winthrop Hospital and while he was working at the New London hospital, and (ii) Dr. Schmigelski's need for additional medical leave to treat his disabilities.

198.    As a direct and proximate result of Defendants' willful, malicious, outrageous, and/or recklessly indifferent and unlawful conduct in violation of the NYSHRL, Plaintiffs have suffered, and continue to suffer, harm for which they are entitled to an award of damages to the greatest extent permitted by law, including, but not limited to, economic damages for past and future lost wages, compensatory damages for emotional harm and punitive damages.

**AS AND FOR AN ELEVENTH CAUSE OF ACTION**
**(Failure to Engage in the Interactive Process Regarding a Reasonable Accommodation in Violation of the ADA)**

199.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 198 above with the same force and effect as though fully set forth herein.

200.    Plaintiffs each suffered from a disability, was perceived as suffering from a disability, and/or had a record of a disability as defined by the ADA.

201.    By the actions described above, Defendants failed to engage in a discussion to determine  whether a reasonable accommodation existed for Plaintiffs' known disabilities by, *inter alia*, failing to engage in any discussions whatsoever regarding (i) Dr. Giuca's need for a reduced schedule working in part at the medical school (which Dr. Giuca helped create and where he successfully has held many leadership positions during his tenure at NYU-Winthrop Hospital) both while Dr. Giuca was working for Defendants at NYU-Winthrop Hospital and while he was working at the New London hospital, and (ii) demanding that Dr. Schmigelski

attend an independent medical examination rather than engage in the interactive process to

determine Dr. Schmigelski's need for additional medical leave to treat his disabilities.

202.    Prior to denying these reasonable accommodations, Defendants failed to engage

in a good faith interactive process to clarify the needs of Plaintiffs and the business and, to the

extent Defendants deemed it necessary, identify appropriate accommodations.

203.    As a direct and proximate result of Defendants' willful, malicious, outrageous,

and/or recklessly indifferent and unlawful conduct in violation of the ADA, Plaintiffs have

suffered, and continue to suffer, harm for which they are entitled to an award of damages to the

greatest extent permitted by law, including, but not limited to, economic damages for past and

future lost wages, compensatory damages for emotional harm, and punitive damages.

## AS AND FOR A TWELFTH CAUSE OF ACTION
### (Failure to Engage in the Interactive Process Regarding a Reasonable Accommodation in Violation of NYSHRL)

204.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1

through 203 above with the same force and effect as though fully set forth herein.

205.    Plaintiffs each suffered from a disability, was perceived as suffering from a

disability, and/or had a record of a disability as defined by the NYSHRL.

206.    By the actions described above, Defendants failed to engage in a discussion to

determine  whether a reasonable accommodation existed for Plaintiffs' known disabilities by,

*inter alia*, failing to engage in any discussions whatsoever regarding (i) Dr. Giuca's need for a

reduced schedule working in part at the medical school (which Dr. Giuca helped create and

where he successfully has held many leadership positions during his tenure at NYU-Winthrop

Hospital) both while Dr. Giuca was working for Defendants at NYU-Winthrop Hospital and while he was working at the New London hospital, and (ii) demanding that Dr. Schmigelski attend an independent medical examination rather than engage in the interactive process to determine Dr. Schmigelski's need for additional medical leave to treat his disabilities.

207.    Prior to denying these reasonable accommodations, Defendants failed to engage in a good faith interactive process to clarify the needs of Plaintiffs and the business and, to the extent Defendants deemed it necessary, identify appropriate accommodations.

208.    As a direct and proximate result of Defendants' willful, malicious, outrageous, and/or recklessly indifferent and unlawful conduct in violation of the NYSHRL, Plaintiffs have suffered, and continue to suffer, harm for which they are entitled to an award of damages to the greatest extent permitted by law, including, but not limited to, compensatory damages for past and future lost wages, and compensatory damages for emotional harm and punitive damages.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION
### (Unlawful Interference in Violation of the FMLA)

209.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 208 above with the same force and effect as though fully set forth herein.

210.    At all relevant times herein, Dr. Schmigelski was an "eligible employee" within the meaning of the FMLA, and Defendants were "covered employers" within the meaning of the FMLA.

211.    By the actions described above, Defendants have unlawfully interfered with Dr. Schmigelski's right to take FMLA leave by removing him from his new role as Lead

Anesthesiologist of the EP Lab at NYU-Winthrop Hospital while he was out on approved FMLA leave, and replacing him with another physician who had no experience in the EP Lab.

212.   As a direct and proximate result of Defendants' unlawful conduct in violation of the FMLA, Dr. Schmigelski has suffered, and continues to suffer, harm for which he is entitled to an award of damages to the greatest extent permitted by law, including, but not limited to, economic damages for past and future lost wages, liquidated damages, reasonable attorneys' fees and expenses and other relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that this Court enter judgment in their favor and against Defendants, containing the following relief:

A.      A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violated the laws of the United States and the State of New York;

B.      An injunction and order permanently restraining Defendants from engaging in any such further unlawful conduct, including the policies and practices complained of here;

C.      An order directing Defendants to place Plaintiffs in the positions they would have occupied but for Defendants' unlawful retaliatory treatment of them, as well as to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices and otherwise unlawful conduct are eliminated and do not continue to affect Plaintiffs;

D.      An award of damages against Defendants in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for all monetary and/or economic damages, including but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment resulting from Defendants' unlawful conduct;

E.      An award of actual damages against Defendants in an amount to be determined at trial, plus prejudgment interest, for lost wages in violation of New York Labor Law §§ 190 et seq.;

F.      An award of liquidated damages against Defendants pursuant to New York Labor Law §§ 190 et seq. and the FMLA;

G.      An award of damages against Defendants in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for harm to their professional and personal reputations and loss of career fulfillment due to Defendants' unlawful conduct;

H.     An award of damages against Defendants, in an amount to be determined at trial, to compensate Plaintiffs for all non-monetary and/or compensatory damages, including, but not limited to, compensation for their mental anguish and emotional distress, as well as harm to their professional and personal reputations and careers due to Defendants' unlawful conduct, under applicable law;

I.     A declaratory judgment pursuant to CPLR §§ 3001 and 3017(b) directing that the Agreements are binding and enforceable;

J.     An award of punitive damages against Defendants;

K.     Pre-judgment and post-judgment interest on all amounts due;

L.     An award of damages against Defendants for any and all other economic losses suffered by Plaintiffs in an amount to be determined at trial, plus prejudgment interest;

M.     An award of costs that Plaintiffs incurred in this action, as well as Plaintiffs' reasonable attorneys' fees to the fullest extent permitted by law; and

N.     Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: Garden City, New York
      July 7, 2021

                              Respectfully submitted,

                              GOODSTADT LAW GROUP, PLLC

                              By: _____
                                    Andrew S. Goodstadt (AG-2760)
                                    George Vallas

                              910 Franklin Avenue, Suite 200
                              Garden City, New York  11530
                              Telephone:   (516) 307-1880
                              Facsimile:   (516) 307-1879

                              COUNSEL FOR PLAINTIFFS